J-S33033-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.L.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: S.A.H., FATHER | : | |
| | : | |
| | : | No. 619 MDA 2024 |

Appeal from the Order Entered April 8, 2024
In the Court of Common Pleas of Centre County Juvenile Division at
No(s):  CP-14-DP-0000024-2022

| | | |
|---|---|---|
| IN RE: ADOPTION OF: M.L.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: S.A.H., FATHER | : | |
| | : | |
| | : | No. 648 MDA 2024 |

Appeal from the Decree Entered April 5, 2024
In the Court of Common Pleas of Centre County Orphans' Court at No(s):
2023-4653 A

BEFORE:  OLSON, J., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED: JANUARY 16, 2025**

Appellant S.A.H. (Father) appeals[1] from the order granting the petition filed by the Centre County Children and Youth Services (the Agency) to terminate Father's parental rights to M.L.H. (Child), born in February of 2019

---

[1] G.L.K. (Mother) filed a petition to confirm consent to have her parental rights to Child terminated.  *See* Trial Ct. Order, "Final Consent Order and Decree," 4/3/24.  Mother is not a party to the instant appeal.

and changing Child's permanency placement goal to adoption.[2]  On appeal,

Father contends that the Agency failed to establish by clear and convincing

evidence the grounds to terminate Father's parental rights.  We affirm.

The trial court set forth the following factual and procedural history:

A child custody action regarding [Child] was initiated by Father against [Mother] on April 30, 2020, at Centre County Docket No. 2020-1163.  By order dated May 11, 2020, Mother and Father shared physical custody of [Child].  [The Agency] referred [Mother and Father] to the Parenting Plus program and opened for protective services on June 9, 2020.  [The Agency] closed protective services on December 8, 2020.

On May 25, 2021, Mother filed a petition for emergency custody, alleging that [Child] suffered significant bruising on her legs and under her arms while in Father's care.  On May 28, 2021, the [trial court] entered an order placing physical custody of [Child] with Mother until such time as [the Agency] was able to interview [Child] regarding the allegations contained in Mother's petition. Father would resume custodial time if the interview did not substantiate abuse or concern by [the Agency] regarding Father. [Child's] treating physician was unable to indicate that the bruises were the result of abuse, and [Child] was too young to communicate effectively or to be interviewed at the Child Advocacy Center.  [The Agency] closed the case on July 16, 2021, with a recommendation that the family continue working with Parenting Plus and begin participating in the Custody Monitoring Program.

On July 21, 2022, following an emergency custody conference, the [trial court] entered an order, indicating that Father's custodial time would be limited to every other Friday to Sunday supervised by a person designated by the [trial court].  By agreement of the parents, Father's custodial time was limited to daytime hours in the community (not in Father's home) and without any overnights. Father was living with his mother who has significant mental health concerns, and the parents agreed for [Child] not to be in

---

[2] This Court consolidated the two appeals *sua sponte* on May 21, 2024.  **See** Order, 5/21/24.

her presence. Also at that time, Father had been charged with several criminal offenses, including homicide by vehicle, aggravated assault by vehicle, recklessly endangering another person, driving with a suspended license, and other offenses related to a deadly accident that occurred on October 14, 2021.

On August 22, 2022, Father filed a petition to modify custody, in which he wrote "[Father] signing over his rights to [Mother] to have sole custody. [Father and his wife] do not have a place of their own to keep [Child]. With the charges against [Father] we do not know how long he will be out. [Mother] has agreed to keep [Child] in [Father and his wife's] lives to keep a relationship with her brother. . . ."

On September 11, 2022, [the Agency] received a child protective services referral, alleging [Child] had bruises on her face and bloody nose upon return to Mother after a visit with Father. The treating physician reported that [Child] had a broken nose and an orbital contusion, and that this was not the first time [Child] had been seen for unexplained injuries. [The Agency] observed that [Child] had bruises and scratches on her neck and cheeks, red marks and bruising on her ear, and dried blood in her nose. [Child] was not able to tell [the Agency] who caused the injuries; however, she said "dad does this" and smacked her own shoulder and leg.

On September 14, 2022, [Child] was seen at the Children's Advocacy Center for a forensic physical examination. [Child] was observed to have bruising and petechiae consistent with nonaccidental trauma. [Child] named "Daddy [S.]," Mother's husband, and "Jazzy" as people who hit her, and demonstrated motions in relation to hitting. Bloodwork for [Child] revealed no known blood condition that would cause the injuries.

A custody conference was held on September 19, 2022, at which time neither parent was able to provide an explanation for the injuries. As a result, the [trial court] directed [the Agency] to take emergency custody of [Child] based on concerns related to the recent and unexplained injuries she suffered. [The Agency] thereafter filed an application for emergency protective custody, which the [trial court] granted. Following the filing of a petition for dependency, the [trial court] adjudicated [Child] dependent on September 28, 2022. [Child] has remained in the care and custody of [the Agency]. She has been in kinship care with her

maternal great aunt and uncle ([Foster Parents]) since October 10, 2022.

Father has been incarcerated since January 9, 2023. He was sentenced on January 9, 2023 to two (2) to six (6) years of confinement in state prison for vehicular homicide related to the fatal accident that occurred on October 14, 2021. His earliest parole opportunity is January 9, 2025. Father is currently housed in the State Correctional Institution at Laurel Highlands. . . .

[Child's] therapist recommended that Father regularly write letters, cards, and drawings to [Child] for [the Agency] to provide to her. The therapist stressed the importance of the letters and occurring regularly. Father has had regular telephone and in[-]person contact with his wife while incarcerated. The reunification counselor, Family Intervention Crisis Services ("FICS"), also asked Father's wife to remind Father to write letters, pictures, drawings and things of that sort to [Child]. Father ultimately failed to comply with this request, sending only four (4) letters to [Child] by the time of [the Agency's] filing of the petition for involuntary termination of parental rights on January 11, 2024. Upon the recommendation of [Child's] therapist, the letters could not be shared with her due to Father's inconsistency in pursuing contact with [Child]. Ultimately, due to Father's failure to consistently follow [the Agency's] recommendations for maintaining contact with [Child, the Agency] was unable to progress towards arranging any in-person visits between Father and [Child].

Father's wife filed for divorce from him in approximately August 2023. Shortly thereafter, the [trial court] ended reunification services for Father's wife due to their pending divorce. Father's wife has since decided not to pursue divorce.

Mother executed an affidavit of consent to adoption on August 31, 2023. Upon consideration of a petition to confirm consent filed by [the Agency] on March 11, 2024, [the trial court] terminated Mother's parental rights to [Child] by a final consent order and decree dated April 3, 2024.

On January 11, 2024, [the Agency] filed a petition for involuntary termination of parental rights of Father. A hearing was held on April 3, 2024. Following the hearing, the [trial court] entered a final order and decree—involuntary termination terminating Father's parental rights and a goal change order to adoption.

Trial Ct. Op., 6/10/24, at 2-6 (citations omitted and formatting altered).

Father filed timely notices of appeal and Pa.R.A.P. 1925(a)(2)(i) statements. The trial court filed an opinion addressing Father's claims.

On November 4, 2024, this Court entered an order directing the trial court to determine whether there was any conflict between Child's best interests and legal interests, such that legal counsel would need to be appointed to represent Child's legal interests. *See* Order, 11/4/24 (citing *In re K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020)). The trial court entered an amended Rule 1925(a) opinion on November 21, 2024, indicating that there was no conflict between Child's best interests and legal interests.[3] Accordingly, the merits of Father's appeal are now ripe for our review.

Father raises the following issues for our review:

1. Did the trial court commit an abuse of discretion and/or error of law in finding that clear and convincing evidence existed to justify termination of Father's rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), (a)(5) and (a)(8)?

2. Did the trial court commit an abuse of discretion and/or error of law in determining that [] Child's developmental, physical and emotional needs and welfare were advanced by terminating [] Father's parental rights?

3. Did the trial court commit an abuse of discretion and/or error of law in that insufficient evidence existed to assess the bond between [] Child and [] Father so as to ensure that termination would best serve the needs of welfare of [] Child?

---

[3] On November 25, 2024, Father filed a statement with this Court stating that he would not be filing an amended brief as a result of the trial court's determination of no conflict. Neither Child's guardian *ad litem* nor the Agency filed a statement.

Father's Brief at 17 (formatting altered).[4]

We begin with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted and formatting altered). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

_____

[4] We note that in his concise statement of errors complained of on appeal filed at trial court docket no. CP-14-DP-0000024-2022, Father raised an issue regarding Child's goal change to adoption. *See* Father's Concise Statement, 4/30/24, at 3 (unpaginated). Father has abandoned this issue on appeal.

In any event, such an appeal is moot in light of this Court affirming the trial court's decree terminating Father's parental rights. *See In re D.R.W.*, 227 A.3d 905, 917 (Pa. Super. 2020) (concluding that an order setting a goal change is moot where the court terminates parental rights).

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We note that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

## Section 2511(a)(2)

In his first issue, Father contends that the trial court erred when it concluded that clear and convincing evidence existed to justify involuntarily terminating his parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8). Father's Brief at 26. Specifically, under Section 2511(a)(2), Father argues that the Agency "failed to prove incapacity, abuse or neglect by Father." *Id.* at 27. Father further states that despite moving through four different correctional institutions, he contacted the Agency directly and sent Child four letters during a ten-month period. *Id.* at 27-28.

Section 2511(a)(2) provides as follows:

**§ 2511.  Grounds for Involuntary Termination.**

**(a) General Rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

To satisfy the requirements of [Section] 2511(a)(2), the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.  The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied.

*In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019) (citations and quotation marks omitted).

Further, this Court has explained:

Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being.  Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect.  This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it[.]

*In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (citations and quotation marks omitted).

> Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." *In re A.L.D.*[, 797 A.2d 326, 340 (Pa. Super. 2002)]. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.*

*In re Z.P.*, 994 A.2d 1108, 1117-18 (Pa. Super. 2010) (some citations omitted and formatting altered).

In addressing the relevance of incarceration on termination decisions under Section 2511(a)(2), our Supreme Court has stated:

> [I]ncarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under [Section] 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*In re S.P.*, 47 A.3d 817, 828 (Pa. 2012).

Further, this Court has explained:

> Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind . . . that the child's need for consistent parental care and stability cannot be put aside or put on hold. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. Rather, a parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in

the path of maintaining the parent-child relationship. Importantly, a parent's recent efforts to straighten out [his] life upon release from incarceration does not require that a court indefinitely postpone adoption.

*In re K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*) (citations omitted and some formatting altered).

Here, the trial court addressed Section 2511(a)(2) as follows:

[The trial court] finds that Father's incapacity caused [Child] to be without essential parental care and that he cannot or will not remedy the causes of that incapacity. The credible testimony of Ryan Clancy [(caseworker for the Agency)] and Tara Chappell [(reunification counselor for Family Intervention Crisis Services (FICS))] established that Father has not met any of the goals established in [the Agency's] permanency plan during the 16 months between [Child's] removal and the filing of the petition for involuntary termination. Based on [the] recommendation from [Child's] therapist, the permanency plan required Father to regularly write letters, cards, and drawings for [Child]. Father ultimately failed to comply with this request, sending only four (4) letters to [Child] received by [the Agency] prior to the filing of the petition for involuntary termination of parental rights on January 11, 2024. Upon the recommendation of [Child's] therapist, the letters could not be shared with [Child] due to Father's inconsistency in pursuing contact with [Child].

The [trial court] believes Father was well aware of the expectation that he regularly write letters, cards, or drawings to [Child]. There were three dependency review hearings following the dependency hearing and prior to [the Agency's] filing of the petition for involuntary termination. Father was present for all the review hearings, either in person or by [Zoom]. At the review hearings, [the Agency] and/or FICS talked in detail about the therapist's recommendation for Father to send letters, drawings, and pictures and the need for consistency. Father was provided with all the [Agency] reports, [the Agency] findings and [trial court] decisions during the dependency proceedings.

Father acknowledged that he received the [trial court orders] following the dependency review hearings, and that his wife informed him of [the Agency's] expectations for him. The [trial

court] believes this included the expectations for Father to write to [Child] regularly. Father and his wife regularly have 15 minute phone calls and 45 minute [Zoom] visits while he's incarcerated. FICS also spoke with Father's wife about telling Father to write letters, pictures, drawings, and things of that sort to [Child]. After [the Agency] filed the petition for termination of parental rights, Father began to send [Child] letters almost weekly, thereby demonstrating to the [trial court] that he had the ability and understanding to have been writing her letters consistently all along.

The [trial court] does not find credible Father's testimony about being unable at times to write letters to [Child]. For instance, from May-June 2023, Father sent 4 letters to Mother, in which he talked about struggles in his relationship with his wife, wanting to be with Mother again, being a "lone wolf" and wanting to leave the state when he got out of prison. Also, while the [trial court] understands Father's personal experience in receiving letters from a parent while he was in placement with [the Agency] as a child, which he explained was causing him hesitancy in what to write to [Child], the [trial court] does not believe that is a proper excuse for failing to regularly communicate with his own child.

In terms of his work with [the Agency] and reunification services, Father sent one letter to FICS in May 2023, in which he talked about things he was doing and his hesitation in sending [Child] letters. FICS asked Father's wife to encourage him to reach out to [the Agency]. [Father's wife] shared a parenting workbook with Father, but he did not send any completed work to [the Agency] or FICS. Although Father has taken 3 job related training courses in prison, he has not taken any parenting courses, indicating that they are available, but he has not applied to them. Father knows that Parenting Plus is available at the prison, but he has chosen not to apply for the program. He has not taken courses on appropriate child discipline.

The [trial court] does not find anything has changed regarding Father's ability to provide a consistent and stable home environment for [Child]. He does not have suitable housing for [Child] currently or upon release from prison. Upon release from prison, Father will not be able to reside with [his] wife due to having a felony conviction unless his wife receives a waiver from the housing authority. If the waiver is not approved, then Father would reside with his sister until Father and his wife can find an apartment.

To Father's credit, he seems to recognize at least some limitations. He admitted that he would not be able to provide [Child] with a safe, happy, and healthy home immediately upon his release from prison. Father testified that he would need to have an adjustment period of "like a three-month period" before being able to care for [Child] because he does [not] want to "get too angry at [Child] . . . if she doesn't do something that she's supposed to." [The trial court] is mindful of Father's suggestions that he will, at some point, be able to provide care and a home for [Child], but feels that Father's suggestions are aspirational. Father's actions to date do not demonstrate that he will undertake parenting responsibilities or be able to provide a proper home and care for [Child].

The [trial court] finds that Father's continued incapacity, neglect, or refusal has caused [Child] to be without essential parental control or subsistence necessary for her physical and mental well-being. [The trial court] also finds that Father cannot or will not remedy this situation. Accordingly, the [trial court] finds that grounds exist for the termination of Father's parental rights pursuant to Section 2511(a)(2).

Trial Ct. Op., 6/10/24, at 10-13 (citations omitted and some formatting altered).

Based on our review of the record, we discern no abuse of discretion by the trial court. *See T.S.M.*, 71 A.3d at 267; *K.M.W.*, 238 A.3d at 474. The record reflects that Father was incarcerated starting in January of 2023. N.T. Hr'g, 4/3/24, at 33. Ms. Chappell testified that she had spoken with Father's wife about telling Father to send letters and pictures to Child while he was incarcerated, and Ms. Chappell testified that Father's wife was cooperative during the attempted reunification process. *Id.* at 34-35. Ms. Chappell also testified that during review hearings, the parties consistently discussed the recommendation for Father to consistently send letters and pictures to Child. *Id.* at 39.

- 12 -

By June of 2023, Child was receiving letters and pictures from Father in a manner that Ms. Chappell described as "very sporadic and few and far between. They were not consistent at all." *Id.* at 38. Specifically, Ms. Chappell testified as follows:

> So, in May of 2023, we got one letter. We didn't get anything else until August of 2023, which is around the time that we had [Child's] scheduled review hearing. At that point, we had gotten two letters and one drawing. And then in September, October, we did receive one more letter. And then we didn't get anything again until January of 2024.

*Id.* Overall, Father sent a total of five things to Child over a ten-month period. *Id.* at 39. By comparison, Ms. Chappell testified that FICS had learned that in May and June of 2023, Father and Mother were corresponding through letters, and that FICS had obtained copies of eleven pages of letters. *Id.* at 40.

As this Court has stated, a "child's need for consistent parental care and stability cannot be put aside or put on hold." *K.M.W.*, 238 A.3d at 474 (citation omitted and some formatting altered). A court is not required to indefinitely postpone adoption to accommodate a parent's effort to straighten out his life following release from incarceration. *Id.* For the reasons stated above, we discern no abuse of discretion by the trial court in concluding that termination was appropriate under Section 2511(a)(2).[5] *See T.S.M.*, 71 A.3d at 267; *K.M.W.*, 238 A.3d at 474. Accordingly, Father is not entitled to relief.

---

[5] We reiterate that we need only agree with the trial court as to one subsection of Section 2511(a). *See B.L.W.*, 843 A.2d at 384.

## Section 2511(b)

We address Father's remaining two issues together. Father alleges that the trial court erred when it involuntarily terminated Father's parental rights because there was insufficient evidence to assess the bond between Father and Child and there was insufficient evidence that termination of Father's parental rights was in Child's best interests. Father's Brief at 30. Father specifically alleges that "the parties [were] directed not to discuss [Father's] existence with [Child]," and that "it appears that there was an intention to terminate the relationship with [Father] to make [Child] available for adoption by [Foster Parents]," rather than encourage a relationship between Child and Father. *Id.* at 32. Finally, Father contends that "[a] change in goal to adoption negates Father's bond with [Child] and allows the Agency to interfere in such a way as to deprive [Child] of her relationship with [Father] and her sibling, and therefore is not in the best interest of her safety, permanency and well-being." *Id.* at 33.

Section 2511(b) provides as follows:

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

> This Court has explained:
>
> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent[s].

*In re C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (some formatting altered), *abrogated in part on other grounds by In re K.T.*, 296 A.3d 1085 (Pa. 2023).

Our Supreme Court has stated that "if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which 'is not always an easy task.'" *K.T.*, 296 A.3d at 1106 (quoting *T.S.M.*, 71 A.3d at 267). In *K.T.*, our Supreme Court explained that "a court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." *Id.* at 1113. Indeed, the parent-child bond analysis must include "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.*

"Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they

have a bond with their foster parents." ***T.S.M.***, 71 A.3d at 268 (citation omitted). More specifically, courts must consider "the child's need for permanency and length of time in foster care . . . whether the child is in a pre-adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." ***K.T.***, 296 A.3d at 1113 (footnote omitted and some formatting altered).

In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***T.S.M.***, 71 A.3d at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

In the instant case, the trial court addressed Section 2511(b) as follows:

[A]s of the date of the [termination of parental rights] hearing, [Child] had not spent any time with Father for over 19 months. Father's efforts to communicate with [Child] were so sporadic and unreliable that his few letters could not be shared with [Child], based on the recommendation of her counselor. [Child] was three (3) years old when Father became incarcerated. She does not know or remember him. Credible testimony confirms that when shown several pictures of Father in April 2023, [Child] did not recognize or remember him. Father's wife also confirmed that when she sees [Child] for . . . visits . . . [Child] does not ask about [Father]. [Child] has never mentioned Father to FICS. FICS does not believe [Child] remembers him, or that a bond exists between Father and [Child]. The [trial court] also finds credible Ms. Chappell's (FCIS) testimony that [Child] is not asking about Father or his whereabouts, to the point that she doesn't even know he's out there somewhere. The [trial court] finds that [Child], now five (5) years old, does not have a bond with Father and that to the extent there is a bond, termination of parental rights will [not]

destroy a necessary and beneficial relationship between Father and [Child].

[Child] has enjoyed the security of kinship placement in a foster home which has provided for her developmental, physical, and emotional needs, which Father has been incapable of while incarcerated. [Child] has a strong bond with her kinship foster parents . . . . [Foster Parents] have provided a stable and loving environment for [Child], in which they and [Child] have developed a strong bond with one another. [Child] has been with [Foster Parents] since October 7, 2022, and she looks to them to meet her needs. On [Child's] own volition, she recently started calling them "mom and dad." Child is thriving in [Foster Parents'] home. She is relaxed and comfortable with [Foster Parents] and seeks their approval and direction. [Child] does not want to leave [Foster Parents'] home. [Foster Parents] arrange for [Child] to spend time with her half-brother (Father and his wife's child). Ms. Chappell credibly testified that [Foster Parents] would arrange for contact between Father and [Child], as long as it is therapeutically appropriate. [Foster Parents] thus appear to have every intent to continue [to] foster[] relationships with [Child's] extended family.

Father's wife has repeatedly told FICS that she believes [Child] should remain with [Foster Parents] because she's thriving, bonded with [Foster Parents], and better off with them. Father's wife feels that [Child] is safe, happy and healthy with [Foster Parents]. Father agrees that [Child] needs stability and permanency.

Trial Ct. Op., 6/10/24, at 18-19 (citations omitted and some formatting altered).

Based on our review of the record, we discern no abuse of discretion by the trial court in concluding that termination of Father's parental rights would best serve Child's needs and welfare. *See K.T.*, 296 A.3d at 1113; *T.S.M.*, 71 A.3d at 267-69. As noted, Ms. Chappell testified that Child has been in foster care for nineteen months. N.T. Hr'g, 4/3/24, at 45. Child has bonded with Foster Parents, as Ms. Chappell testified that Child seeks Foster Parents

to meet her needs.  *Id.* at 47.  Ms. Chappell further testified that Child, on her own volition, has started calling Foster Parents "mom and dad."  *Id.* Finally, Ms. Chappell testified that termination of Father's parental rights would best serve Child's welfare, needs, and her best interests physically, developmentally, and emotionally.  *Id.* at 50.  On this record, we agree with the trial court's conclusion that the termination of Father's parental rights would be serve Child's needs and welfare.  *See* 23 Pa.C.S. § 2511(b); *K.T.*, 296 A.3d at 1113.  Therefore, the trial court did not err in terminating Father's parental rights.  *See T.S.M.*, 71 A.3d at 267.  For these reasons, we affirm.

Order affirmed.  Decree affirmed.  Jurisdiction relinquished.


Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary


Date: 1/16/2025